IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNIVERSITY OF OREGON,

        Plaintiff,

  v.

MONICA DRUMMER and ARTHUR J.
GALLAGHER RISK MANAGEMENT
SERVICES, INC., an Illinois
Corporation,

        Defendants.

---

MONICA DRUMMER and ARTHUR J.
GALLAGHER RISK MANAGEMENT
SERVICES, INC., an Illinois
Corporation,

        Third-Party Plaintiffs,

  v.

MARSH U.S. CONSUMER, a service of
SEABURY & SMITH, INC., a Delaware
Corporation,

        Third-Party Defendant.

Case No. 6:15-cv-00260-AA
OPINION AND ORDER

---

Joshua P. Strump
Harrang Long Gary Rudnick P.C.
1001 SW Fifth Ave., 16th Floor
Portland, OR 97204

1 - OPINION AND ORDER

    Attorney for plaintiff

John E. Zehnder
Robert P. Schulhof, Jr.
Scheer & Zehnder LLP
101 SW Main St., Suite 1600
Portland, OR 97204
    Attorneys for defendants/third-party plaintiffs

James T. McDermott
Gabriel M. Weaver
Ball Janik LLP
101 SW Main St., Suite 100
Portland, OR 97204
    Attorneys for third-party defendant

AIKEN, Chief Judge:

    Third-party defendant Marsh U.S. Consumer, a service of Seabury & Smith, Inc. ("Marsh"), moves to dismiss third-party plaintiffs Monica Drummer and Arthur J. Gallagher Risk Management Services, Inc.'s (collectively "AJG") claims pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, Marsh's motion is granted in part and denied in part.

## BACKGROUND

    In July 2012, plaintiff University of Oregon ("University") began negotiating the terms of an insurance policy to cover bonuses and payments that could come due to the University's football coaching staff. Through its employment contracts with the coaches, the University had tied bonus payments to the team's success. The University wanted to insure against the possibility the football team would do well, triggering a higher level of bonus payments.

2 - OPINION AND ORDER

---

The University initially negotiated the policy with Marsh. After Marsh provided a quote, the University asked the Chief Risk Officer of the Oregon University System ("OUS") to help it purchase the coverage. OUS informed the University it was required to procure insurance through AJG, OUS's preferred broker.

OUS discussed the details of the sought-after policy with AJG on September 4, 2012. This gave AJG only days to secure the policy because the football season had already started. To accommodate this tight timeline, AJG approached Marsh for help. The two brokers entered into a Sub-Broker Agreement[1] on September 6, 2012. Per the agreement, Marsh assisted with the negotiations, controlled the quote and binding of the insurance, and determined AJG's sub-commission. The agreement also prohibited AJG from "writ[ing] any documents regarding or interpreting coverage without prior written approval from Marsh." Weaver Decl. Ex. A, at 1.

After reviewing the negotiated coverage, the University was concerned the policy did not cover all bonus scenarios. On September 7, 2012, the University emailed AJG the following:

> Greetings, we just have one clarification question. Please confirm the maximum amount indicated is the ceiling of coverage but does not preclude lower amounts being covered . . . We believe this is the case, but want to confirm.

---

[1] AJG refers to and relies on the Sub-Broker Agreement in its third-party complaint, such that the Court considers this document in evaluating Marsh's motion. Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005).

3 - OPINION AND ORDER

Am. Compl. ¶ 15. AJG responded:

> That is correct. Any one item can trigger a partial payment of the loss limit. Referring to page 6 of the quote, if any one or combination of events occurs, the policy will pay. That is per my conversation with [Marsh] yesterday.

Am. Compl. ¶ 16. Later that day, the insurance policy was executed.

The University had a successful 2012-2013 football season, but the team did not play in the national championship. As a result, the University paid out $687,965.74 in bonuses to its football coaches. The University subsequently made a claim under its policy but was informed the insurance only covered maximum bonuses and not the lesser bonuses actually paid. Therefore, the University's claim was denied.

On January 5, 2015, the University filed a complaint against AJG in Lane County Circuit Court; AJG removed the case to this Court. On March 13, 2015, the University filed an amended complaint, realleging its negligence and contract-based claims.

On March 27, 2015, AJG answered the amended complaint and included a third-party complaint against Marsh for indemnity, contribution, negligence, and negligent misrepresentation. AJG later agreed to withdraw its indemnity claim (second cause of action). On June 22, 2015, Marsh filed the present motion to dismiss.

**STANDARD OF REVIEW**

4 - OPINION AND ORDER

Where the plaintiff "fails to state a claim upon which relief can be granted," the court must dismiss the action. Fed. R. Civ. P 12(b)(6). To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). For purposes of a motion to dismiss, the complaint is liberally construed in favor of the plaintiff and its allegations are taken as true. Rosen v. Walters, 719 F.2d 1422, 1424 (9th Cir. 1983). Bare assertions, however, that amount to nothing more than a "formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true." Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009). Rather, to state a plausible claim for relief the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions. Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

## DISCUSSION

### I. Negligence-Based Claims

Marsh first moves to dismiss AJG's claims for negligence and negligent misrepresentation, arguing those claims are barred by Oregon's economic loss rule. AJG responds that rule does not apply, alleging the Sub-Broker Agreement created a special relationship between Marsh and AJG. I agree with Marsh the negligence-based claims must be dismissed.

Ordinarily, Oregon law bars the recovery of purely economic

5 - OPINION AND ORDER

loss in a negligence setting. Hale v. Groce, 304 Or. 281, 284 (1987). A negligence claim for the recovery of economic losses can proceed, however, if it is "predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm." Onita Pac. Corp. v. Trs. of Bronson, 315 Or. 149, 159 (1992). The existence of this special duty of care, also known as a "special relationship," is a legal question to be determined by the court. A.T. Kearney, Inc. v. Int'l Bus. Machs. Corp., 73 F.3d 238, 241 (9th Cir. 1995).

AJG contends a special relationship existed here. Specifically, AJG alleges Marsh would not cooperate until the parties entered into the Sub-Broker Agreement. "Per the Sub-Broker Agreement," Marsh controlled various aspects of the negotiations. Second Am. Answer, Affirmative Defenses and Third-Party Compl. ¶ 84. Therefore, AJG alleges Marsh assumed the role of Broker, superior to AJG's role of Sub-Broker. As such, Marsh allegedly owed AJG a duty of care and fair dealing. Marsh disputes the existence of a special relationship, arguing it and AJG were negotiating at arm's length as adversarial parties, evidenced by their contractual relationship under the Sub-Broker Agreement.

On the facts alleged, there was no special relationship between AJG and Marsh. To determine whether there is a special relationship, a court must "examine the nature of the parties' relationship and compare that relationship to other relationships

6 - OPINION AND ORDER

in which the law imposes a duty on parties . . . beyond the common law duty to prevent foreseeable harm." Conway v. Pac. Univ., 324 Or. 231, 239 (1996)(citing Onita, 315 Or. at 160). The Oregon Supreme Court has delineated certain relationships in which the law imposes a special duty of care to further the economic interests of the client: "those between 'professionals' such as lawyers, physicians, architects and engineers and their clients; those between principals such as brokers and their agents; those between trustees and beneficiaries; and, in some instances, those between insurers and their insureds." Jones v. Emerald Pac. Homes, Inc., 188 Or. App. 471, 477 (2003). The common thread in these relationships is "one party has authorized the other to exercise independent judgment in his or her behalf and, consequently, the party who owes the duty has a special responsibility to administer, oversee, or otherwise take care of certain affairs belonging to the other party." Conway, 324 Or. at 241.

If the relationship is not one of those enumerated by the Oregon courts, a court must examine all aspects of the relationship and determine whether it creates the same type of relationship as those already recognized. Id. at 242. This includes an examination of any contract between the parties, which "serves to help determine the type of relationship between the parties, but not to determine the existence or type of duty." Id. (emphasis in original). Overall, this inquiry is functional, not formal, and

7 - OPINION AND ORDER

"the crucial aspect of the relationship is not its name, but the roles that the parties assume in the particular interaction where the alleged tort and breach of contract occur." <u>Strader v. Grange Mut. Ins. Co.</u>, 179 Or. App. 329, 334 (2002).

As a threshold matter, the relationship alleged by AJG is not one of the enumerated categories of relationships in which Oregon law imposes a special duty of care. Further, examining the nature of the relationship, AJG's allegations still fall short. AJG relies on alleged aspects of Marsh's control to show Marsh's superior position in the negotiations and its independent exercise of authority on AJG's behalf. However, these aspects derive from the Sub-Broker Agreement, and adopting AJG's characterization of Marsh based solely upon the agreement's terms would transform the contractual obligation into a tort duty. <u>See Georgetown Realty v. The Home Ins. Co.</u>, 313 Or. 97, 111 (1992) (recognizing tort duty must exist "independent of the contract and without reference to the specific terms of the contract").

Instead, the facts alleged indicate both parties acted on their own behalf: AJG took advantage of an opportunity to secure an insurance policy for a client, and Marsh regained its access to the negotiations and commission. AJG contends the time-sensitive nature of the negotiations, and Marsh's involvement prior to the Sub-Broker Agreement, placed AJG in a state of reliance. While it is true AJG entered into the agreement to streamline the transaction,

8 - OPINION AND ORDER

AJG made that choice in light of a business opportunity. As OUS's preferred broker, AJG entered the relationship on equal professional footing and was fully aware of the commercial activities involved. With respect to AJG, Marsh was nothing more than an adversarial party negotiating at arm's length. Therefore, Marsh's motion to dismiss AJG's negligence-based claims (third and fourth causes of action) is granted.

II. Contribution Claim

Marsh next moves to dismiss AJG's contribution claim (first cause of action), again arguing the economic loss rule bars recovery. The right to contribution under Oregon law is set out at Or. Rev. Stat. § 31.800. This section provides, in pertinent part:

> where two or more persons become jointly or severally in tort for the same injury to person or property . . . there is a right of contribution among them even though judgment has not been recovered against all or any of them. There is no right of contribution from a person who is not liable in tort to the claimant.

Or. Rev. Stat. § 31.800(1) (2015) (emphasis added). Therefore, to proceed on its contribution claim, AJG must show Marsh is liable in tort to the University. Jensen v. Alley, 128 Or. App. 673, 677 (1994). Thus, the inquiry is whether there was a special relationship between Marsh and the University. If there was not, the economic loss rule would bar recovery.

AJG has sufficiently pled the existence of a special relationship between Marsh and the University. In Oregon,

9 - OPINION AND ORDER

"nongratuitous suppliers of information owe a duty to their clients or employers <u>or to intended third-party beneficiaries</u> of their contractual, professional, or employment relationship to exercise reasonable care to avoid misrepresenting facts." <u>Onita</u>, 315 Or. at 165 (emphasis added). Oregon recognizes three classes of third-party beneficiaries: creditor, donee, and incidental beneficiaries. <u>Sisters of St. Joseph of Peace, Health, and Hosp. Servs. v. Russell</u>, 318 Or. 370, 374-75 (1994). Further, the professional must be acting, at least in part, to further the economic interests of the person to whom the duty is owed. <u>Meininger v. Henris Roofing & Supply of Klamath Cnty., Inc.</u>, 137 Or. App. 451, 454 (1995).

In <u>Meininger</u>, plaintiffs were prospective buyers of a home who asked a real estate agent to obtain a roof inspection. <u>Id.</u> at 453. The agent entered into a contractual relationship with the defendant, a roofing company. <u>Id.</u> The defendant provided a professional opinion about the condition of the roof, "which it knew would be communicated to and relied upon by plaintiffs." <u>Id.</u> at 455. Because the "purpose of that inspection was to provide an opinion . . . to plaintiffs," the plaintiffs were intended beneficiaries of the contract, and therefore a special relationship existed between the parties. <u>Id.</u> at 454.

It is reasonable to infer the University was the intended third-party beneficiary of the Sub-Broker Agreement. Just as the roofer in <u>Meiniger</u> knew the purpose of the inspection was to assist

10 - OPINION AND ORDER

the prospective buyers in deciding whether to purchase the home, Marsh knew the purpose of the Sub-Broker Agreement was to assist the University in obtaining the insurance policy. By entering into the Sub-Broker Agreement, Marsh was acting, in part, to further the University's economic interests. Because a special relationship existed between Marsh and the University, the economic loss rule does not bar AJG's contribution claim.

Marsh next argues AJG has no right to contribution because AJG breached the Sub-Broker Agreement when it gave advice without Marsh's consent. Factual disputes are not subject to resolution on a motion to dismiss. See Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1051 (9th Cir. 2008) (dismissal under Rule 12(b)(6) improper where argument in support "hinge[d] on factual disagreements rather than legal deficiencies"). Generally, the question of breach of contract "is a question of fact to be left to the trier of fact." Palmiero v. Spada Distrib. Co., 217 F.2d 561, 565 (9th Cir. 1954).

On this record, whether the email correspondence between AJG and the University constituted a breach of the Sub-Broker Agreement remains a question of fact. Marsh may have been aware of or even consented to AJG's email, which indicates the reassurance regarding coverage was "per [AJG's] conversation with [Marsh]." Am. Compl. ¶ 16. Moreover, even if there was a clear material breach of the Sub-Broker Agreement, that would only relieve Marsh of its contractual

11 - OPINION AND ORDER

duty to AJG; it would not necessarily resolve the separate question of whether Marsh breached its duty to the University. Therefore, Marsh's motion to dismiss AJG's contribution claim is denied.

## CONCLUSION

Marsh's Motion to Dismiss (doc. 24) is GRANTED as to AJG's negligence-based claims (third and fourth causes of action) and DENIED in all other respects.

IT IS SO ORDERED.

Dated this 10th day of November, 2015.

                                                     Ann Aiken
                                     United States District Judge